(No. 86-CC-2517–

BERTHA PRO, Individually and as Administrator of the Estate of ELIO PRO, Deceased, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed September 30, 1994.*

*Order on petition for rehearing filed February 9, 1995.*

BERTHA PRO, *pro se*, for Claimant.

JIM RYAN, Attorney General (NUVIAH SHIRAGI, Assistant Attorney General, of counsel), for Respondent.

OPINION

JANN, J.

Claimant, Bertha Pro, as Administrator of the Estate of Elio Pro, deceased, and Bertha Pro, individually, filed a

complaint in the Court of Claims on March 3, 1986. In her complaint Mrs. Pro alleges negligence on the part of the Respondent, State of Illinois, which resulted in the death of her son, Elio Pro. She alleges that her son was driving an automobile on Veteran's Parkway in Normal, Illinois, on March 3, 1984, in a southerly direction. She further alleges the decedent's vehicle left the roadway and traveled in the median strip inside the guardrail until the vehicle went over an embankment into a creek and her son was killed. She claims the State was negligent in its erection and maintenance of the guardrail which she alleges prevented the vehicle from returning to the roadway. The State filed its answer denying the claim on May 1, 1986.

The case was tried by the Commissioner assigned to the case. The evidence consists of the two-volume transcript of testimony from August 22, 1990; certain admissions from the request for admissions filed by Respondent (which includes a transcript of the coroner's inquest); Claimant's exhibits and Respondent's exhibits. Oral arguments were heard on February 18, 1993.

### The Facts

The Claimant's decedent, Elio Pro, died in the early morning hours of March 4, 1984, in a single-vehicle accident along Veteran's Parkway in Normal, McLean County, Illinois. The accident occurred at about 2:00 a.m. at a site 550 feet north of the intersection with East Vernon Avenue. Veteran's Parkway is a four-lane road, with two southbound and two northbound lanes. There is a grass median between the northbound and southbound lanes which is 30 feet wide. There are dual bridges which span a creek at the scene of the accident, however the grass median does not slope down to the creek. There are concrete retaining walls on either side of the creek. It is

17 feet, 2 inches from the creek bed to the top of the retaining walls, and from the retaining walls, it is a sheer drop to the creek below.

There is no overhead lighting at the creek. The closest lighting was at an intersection about 3/10 of a mile away. At the time of the accident, the posted speed limit for Veteran's Parkway was 45 miles per hour and the average daily traffic count was 15,700. The bridge for southbound traffic had concrete parapets which were two feet off the edge of the pavement. The concrete parapet on the median for southbound traffic and the creek were protected by 125 feet of guardrail. This included 100 feet of guardrail plus a 25-foot terminal section with the first 12½ feet of the terminal section at full height and the last 12½ feet comprising a turn-down. The dual bridges were originally constructed in the 1940s. In 1970, the pavement at the dual bridges was upgraded and the guardrails were installed. There was no major construction at this site since the 1970 to 1972 time period and the configuration of the guardrail and the retaining walls were unchanged from that period to the date of the accident.

At approximately 2:00 a.m. on March 4, 1984, the car that Mr. Pro was driving left the roadway and began traveling in the grass median between the northbound and southbound lanes of Veteran's Parkway. The car proceeded in a southerly direction in the median until the car went over the concrete retaining wall abutting the creek, at which time the car dropped over the edge and into the creek below. There were no passengers found in the car and there were no eyewitnesses to the accident.

Sometime between 1:00 a.m. and 2:00 a.m. on March 4, 1984, the decedent drove Mr. Russell Shelton to Mr. Shelton's Towanda home after a party on the east side of Bloomington. Mr. Shelton had met the decedent

at this party and there was beer being served at the party. Mr. Shelton testified that he had consumed probably 10 beers at this party. Mr. Shelton further testified that the route from the party to Towanda would include proceeding northbound on Veteran's Parkway, that the vehicle Mr. Pro was driving was a Mazda RX-7, and that Mr. Pro and Mr. Shelton were the only persons in the vehicle as it proceeded northbound to Towanda. Mr. Pro let Mr. Shelton off in Towanda and Mr. Pro then started driving back to Bloomington going southbound on Veteran's Parkway. Decedent drove off the pavement into the grass median and then drove over the creek's retaining wall where he died.

This accident was investigated by Sergeant Ralph Ebert of the Normal police department. Mr. Pro was already dead when Sergeant Ebert arrived. The accident had been reported to the police by a passerby who had happened upon the scene while walking. The investigation revealed that there appeared to be a tire mark and two scrape marks across the top of the north end of the median guardrail for southbound traffic. Sergeant Ebert scraped the marking at the scene and it came free. He believed the substance to be tire substance. The tread design of the tire mark on the guardrail turn-down matched the tread design of decedent's automobile. Sergeant Ebert also observed a set of tire impressions that started just off the roadway approximately ten feet to the north of the guardrail that proceeded across the guardrail turn-down, and then straight toward the creek retaining walls. The markings on the guardrail turn-down and the tire impressions in the grass median appeared to be fresh. The grass in the median was still in a downward position and in the direction of what Sergeant Ebert felt was the vehicle's direction of travel. The tire impression could be traced from the north retaining wall all the way

back to the guardrail turn-down. There was another set of tire impressions in the median, but those tire impressions had a larger wheel base than that of decedent's auto.

Scrape marks were observed on the south retaining wall, approximately eight feet above the creek bed. The paint marks in the scrape observed on the south retaining wall were made by a gray automobile and the decedent's vehicle was charcoal gray.

The auto decedent was driving was a 1983 Mazda sports coupe. The headlight switch was in the on position and there was no damage to the wheels or tires of the vehicle. An engineering inspection of the vehicle by Professor Hank Campbell of the Department of Industrial Technology at Illinois State University revealed that the decedent had not been engaged in a hard braking maneuver. Sergeant Ebert observed no evidence of braking or other evasive maneuvers at the scene. From all the evidence, including Professor Campbell's study, it appeared the vehicle was in excellent condition before the accident, and that there were no mechanical problems which contributed to the accident.

Professor Campbell testified that there was no damage to the tires or wheels of the car. Professor Campbell further testified that in hard braking situations, there would usually be some discoloration on some of the retaining clips, but that there was no such discoloration apparent on Mr. Pro's vehicle. Additionally, Professor Campbell testified that the car was not in a brake lock-up condition at the time of the accident, that the car had rack and pinion steering which is a very quick and direct way to steer, that the steering mechanism was functional even after the accident, and that the steering wheel was in a straight ahead normal driving position at the time of investigation. Professor Campbell was of the opinion that

there were no evasive maneuvers taken at the time of the accident.

At the time of his death, Elio Pro was engaged to be married. He was attending Illinois State University and he had been working between 20 and 40 hours per week at an Eagle supermarket. Mr. Pro was survived by his mother, Bertha Pro, two sisters and one brother.

It is Claimant's position that the guardrails had a causal relationship to the death of Mr. Pro. Mr. Andrew Svirha, who was a civil engineer with IDOT's district three division, testified the guardrails near the creek where decedent died were installed during a construction project which started in 1970 and was finished in 1972. Mr. Svirha further testified that at the time of the 1970 to 1972 project, IDOT's policy regarding the installation of guardrails, and the decision of where to put guardrails, was governed by the design manual, and that during the 1970 project, the road would be constructed in accordance with the policy in force at the time of the construction.

Mr. Charles David Sanders, IDOT's expert on guardrails, testified as part of his duties as policy engineer for IDOT, and as a former unit chief of the standards and specifications department for IDOT, that he and his employees have maintained records of all standards that have been issued by IDOT as highway standards. Mr. Sanders testified that the documents which compose Respondent's Exhibit Number 3 were the applicable standards governing the 1970 road project and that Respondent's Exhibit Number 4 constituted the design manual which governed the same project. Mr. Sanders was able to determine that the minimum guardrail length required for the 1970 project was 112.5 feet and the guardrail which was in fact constructed during the 1970 project

conformed to that minimum standard. Mr. Sanders further testified that his review of IDOT's records indicated that there had not been any upgrading of these guardrails.

Mr. Ralph Demoll, a civil engineer with IDOT's district three division, testified that IDOT's policy concerning upgrading guardrails is that when IDOT undertakes a major improvement such as resurfacing or geometric improvement, then IDOT also upgrades the guardrail at that time. Mr. Demoll further testified that it is not IDOT's policy to upgrade guardrails simply because IDOT's standards for guardrails change. Finally, Mr. Demoll testified that there were no major construction projects or improvements made at the site from 1970 to 1984.

Mr. Sanders testified that, in addition to upgrading guardrails at the time of a major construction project, IDOT might upgrade the guardrail if the guardrail had been the subject of major citizen complaints or if located at a high accident location. Mr. Sanders further testified that he had looked through IDOT's records dealing with this accident and that the evidence he found was that there had not been any citizen complaints or evidence that this was a high accident site. Mr. Sanders' review indicated that there had not been any accidents of significance at the guardrail.

The dual bridges were originally constructed in the 1940s. In 1970, the pavement at the bridges was upgraded and the guardrails were installed. There were no changes to the creek or retaining walls during the 1970 project. The guardrail in question was 125 feet long and had not been changed in any manner since its original installation in 1970, and as conceded by IDOT's engineers, there were no barriers, fences, signs, or other warnings at or near the retaining wall.

IDOT's engineers testified that the standard for length of guardrail in 1970 were set forth in standard 2231-3 and section 2-240.07 of the 1968 IDOT design manual.

Standard 2231-3 is entitled "Typical Applications of Steel Plate Beam Guardrail." The diagrams entitled "Guard Rail at Structure" require a minimum of 100 feet of guardrail according to the IDOT engineers. However, section 2-240.07 of the 1968 IDOT design manual requires a minimum guardrail length of 112 feet and 6 inches in the present situation. According to IDOT's own engineers, section 2-240.07 of the design manual overrides standard 2231-3.

IDOT's position was that the extra length of the guardrail in question (12½ feet) was sufficient protection for both the concrete bridge parapet and the 17-foot drop to the creek, and that there was no need for additional protection right at the retaining wall itself.

Michael Griffin was Claimant's expert. Mr. Griffin is an engineer with the Cook County highway department. Although he is now chief engineer of the right-of-way department, he had previously been resident engineer in charge of construction projects. He had been trained in the selecting, locating and designing of traffic barriers, and was familiar with the State of Illinois design standards for guardrails on highways. Part of his past responsibility with the Cook County highway department had been the design of guardrails. He had been licensed as a professional engineer for 28 years at the time of the hearing. The court accepted Mr. Griffin as an expert based on his qualifications.

Claimant's expert testified that the guardrail, as originally constructed, was not long enough. In 1964, the National Academy of Scientists National Research Council

published *Highway Research Board Special Report 81.* This publication specifically deals with overpasses with twin bridges, which is the situation at the location in this case. This publication indicates a desired length of guardrail of 150 to 200 feet.

IDOT engineers have adopted the position that special report 81 was merely a recommendation and not a mandate. Mr. Griffin also described report 81 as a guide rather than a standard for the construction of guardrails, and admitted that the State standards were controlling to the issue of whether the guardrail in this case was constructed within the proper parameters. The IDOT engineers conceded that the guardrail standards in Illinois were basically whatever the engineers at IDOT said they were. What Charles Sanders (IDOT's expert witness) calls a "standard" is whatever IDOT has adopted and therefore decided to call a standard. The IDOT design manual is written by IDOT engineers. The design manual is based in large part upon Federal publications. Special report 81 played a large role in what was eventually adopted by IDOT in its design manual. However IDOT makes the decision as to which Federal recommendations it does not adopt and IDOT did not adopt the recommendation of 150- to 200-foot guardrails at dual bridges.

IDOT considered the creek to constitute a roadside hazard because the creek traversed the entire median and because there was a 17-foot vertical drop to the creek with no slope or incline. IDOT's engineers acknowledged that the purpose of the guardrail in question was to protect not only against the concrete bridge parapet, but also against the vertical drop to the creek. According to IDOT engineers, regardless of the concrete bridge parapet, there would still have been a need for a guardrail to protect against the vertical drop to the creek.

Claimant's expert testified that the lack of barriers, fences or other warnings in correct proximity to the retaining wall was a hazardous condition. In Mr. Griffin's opinion, IDOT's reliance on standard 2231-3 was misplaced. This standard does not directly relate to the type of hazard that actually existed at the location where Mr. Pro died. Standard 2231-3 does not address the situation of a non-traversable roadside hazard spanning the entire width of the median. Standard 2231-3 does depict a hazard which is analogous to the location herein which is the drawing entitled "Guardrail in Median of 30 Feet and Less" for two center piers. This standard requires the guardrails to taper so that they meet in the center of the median. This would prevent a car from getting behind the guardrails and striking the center piers. In Mr. Griffin's opinion, the 17-foot drop involved in this accident was more hazardous than the center piers depicted in standard 2231-3. A driver can see the center piers, but may not be able to see the drop off. If you hit a pier at low speed you should survive, but if you go over the vertical drop, even at five m.p.h., you would most likely be killed. IDOT's engineers admitted that the injuries caused by a 17-foot vertical drop at five m.p.h. would be much more severe than a five m.p.h. impact with a center pier. IDOT's expert testified that the vertical drop has a severity index of 9.8, which meant that 99% of the people going over the drop are going to be killed.

Mr. Sanders confirmed that report 81 was presented as recommendations and guides as opposed to adopted standards. He also testified that other parts of report 81 indicated that the appropriate length for the guardrail in this case was a minimum of 75 feet. Mr. Griffin also testified that in his opinion, IDOT's policy of upgrading guardrails to the extent possible when the project next

came up for repair or maintenance of some kind was a reasonable policy. Mr. Griffin further testified that changes are generally made on roadways in the State when the roadway is scheduled for a new repair or improvement.

In 1977 the American Association of State and Highway Transportation Officials (AASHTO) published guidelines and suggestions for guardrail placement and length. The title of the publication was "Guide for Selecting, Locating and Designing Traffic Barriers." Section III-E-4 of the 1977 AASHTO publication determines the length of guardrail. The length of guardrail need is determined by the posted speed limit and the average daily traffic count. This guide does not have a listing for 45 m.p.h. but does have a listing for both 40 m.p.h. and 50 m.p.h. According to this guide, the length of need for 40 m.p.h. is 240 feet and the length of need for 50 m.p.h. is 320 feet. The run-out length at 40 m.p.h. is 240 feet and the length of need for 50 m.p.h. is 320 feet. IDOT engineers concede that the guardrail run-out length is based upon braking requirements. The run-out length at 40 m.p.h. is 240 feet because it takes 240 feet to bring a vehicle to a stop or regain control of the vehicle, when traveling 40 m.p.h. The recommendations set forth in the 1977 AASHTO publication were adopted, almost verbatim, in the 1978 IDOT design manual. The 1978 IDOT design manual, however, broke down the guardrail length of need requirements into 5 m.p.h. increments, rather than the 10 m.p.h. increments set forth in the 1977 AASHTO publication. The 1978 IDOT design manual required 280 feet of guardrail at the location of this accident. The guardrail in question does not conform to these standards. However, these standards were adopted after the guardrails were put in place in 1970.

The concept of guardrail "run-out length" was introduced with the Highway Research Board's special report 107. Special report 107 was based upon data accumulated before 1970. IDOT, having participated in the study, was aware that for an average daily traffic count of 15,700 at 45 m.p.h., a run-out length of 280 feet was required. IDOT engineers agree that it is a part of their duty to monitor structures on State highways. Teams of IDOT engineers inspect the condition of bridges on a cyclical basis. There is currently a two-year inspection cycle for bridges. Wen a bridge is inspected pursuant to this cycle, the guardrail at the bridge is also inspected. If during one of these periodic inspections an IDOT engineer sees an unsafe condition, he is supposed to note it in his report.

Mr. Griffin testified that in his opinion, IDOT has a duty to upgrade and maintain guardrails. Mr. Griffin also expressed the opinion that, if a hazard exists and guardrail standards come out that indicate the guardrail should be a longer length, the longer guardrail should be installed and IDOT should not wait until the next time there is a major construction project at that site.

Because the nature of roadside hazards can change, IDOT has adopted a specific program to inspect for unwarranted guardrails. This policy to specifically inspect for unwarranted guardrails has been in effect for the last 10 years. In order to adhere to this policy, it has been necessary for IDOT and maintenance engineers to inspect every guardrail in the State of Illinois. IDOT engineers, however, testified that it was IDOT policy to change guardrails only in conjunction with "major construction" projects.

Oral arguments were held on February 18, 1992. Claimant's attorney argued that IDOT had a duty to upgrade the guardrails in question to meet more rigorous

standards than those in effect upon their initial installation because the State misapprehended the nature of the hazard. Claimant argued the guardrails installed were to protect a bridge parapet rather than the 17-foot drop in the median strip. Claimant's counsel argued that a tapered set for guardrails ending and beginning in a point which would prevent persons getting behind the rail would have averted Claimant's fatal injuries and that Respondent was negligent in failing to apply the more rigorous standard at the time the subject guardrails were installed.

Claimant's counsel acknowledged that pure comparative negligence was the applicable standard at the time of the occurrence. He further acknowledged that no evidence exists as to what caused Claimant to enter the median strip.

Respondent argued that an imposition of mandatory upgrades of guardrails is not economically feasible and that the imposition of such a financial burden might encourage the retention of outdated standards and practices by IDOT. Respondent further argued that the State is not an insurer of persons driving off the roadway.

Respondent also addressed the issue of comparative negligence stating that although comparative negligence applies, it is impossible to determine Claimant's portion of fault due to the lack of evidence as to what caused Claimant to leave the roadway.

Claimant's counsel reasserted his contention that deviation from the roadway and into the area behind the guardrail was foreseeable and that the guardrails were negligently designed and argued that Respondent bears the burden of showing Claimant's contributory negligence, if any.

Both parties submitted briefs in this matter.

In order to prevail in this case, Claimant must prove by a preponderance of the evidence that Respondent was negligent in the design or maintenance of the subject guardrails, that the Respondent knew or should have known of a dangerous condition and that failure to implement stricter standards or otherwise maintain the guardrails was the proximate cause of Claimant's injuries. *Evans v. State* (1988), 40 Ill. Ct. Cl. 140; *Kraemer v. State* (1990), 42 Ill. Ct. Cl. 23.

A review of applicable case law cited by both parties and through the Court's research leads us to two cases which most closely apply to the facts of this case. In *Hodge v. State* (1981), 35 Ill. Ct. Cl. 51, Claimant sought to recover damages due to striking a concrete box culvert with 8-inch by 10-foot headwalls rising 1.5 feet above the pavement lying near the traveled portion of the highway. Claimant struck the headwall after veering off the roadway, presumably caused by a bald tire. Claimant argued that "the presence of the headwall rendered the roadway unsafe" and introduced evidence that highway construction standards in existence on the date of the accident were such that concrete culverts, such as that involved, were obsolete as of March 3, 1943, and were in the process of removal by the State and county. *Hodge, supra,* at 52, 53.

The Court held that changes in highway construction standards to provide greater safety to the motoring public do not necessarily require that the State constantly upgrade highways to meet those standards. The Court further found that such an imposition of responsibility would be impossible to meet in view of public finances and available manpower. *Hodge v. State, supra.*

The Illinois Supreme Court has also recently addressed a similar circumstance in *DiBenedetto v. Flora Township* (1992), 153 Ill. 2d 66; 605 N.E.2d 571; 178

Ill.Dec. 777. The Claimant was killed in a one-car accident when his car crossed the center line of a county highway, entered the shoulder and overturned in a drainage ditch, even though it was alleged that the ditch was unusually steep. The Court found in pertinent part:

"Drainage ditches along streets and highways are both commonplace and necessary. People are not expected to drive in them and the public cannot be an insurer of those who do. Although there is a paucity of cases on this issue, we interpret the lack to the fact that the conclusion is obvious and that the opposite result would be contrary to normal expectations and experience in the affairs of life." *DiBenedetto, supra.*

The Supreme Court discussed proximate causes and found the proximate cause of the accident was the loss of control of the vehicle and its being driven off the traveled way. *DiBenedetto, supra.*

Based upon the foregoing, we hereby find Claimant has failed to meet its burden of proof in demonstrating a breach of duty by the State and that proximate cause has not been proven. Claimant's tragic death is certainly lamentable, but the evidence is not adequate to support an award in this cause. There was no notice of a dangerous condition to persons traveling the roadway with reasonable care. Claimant's assertion that new standards must be implemented constantly to guardrails must fail for lack of feasibility.

This claim is hereby denied.

## ORDER

JANN, J.

This cause comes on to be heard on Claimant's petition for rehearing. The Court has reviewed the record herein and finds Claimant's petition is hereby denied.